Good morning, thank you. Okay, second case this morning is case number 416-0437. This caption is going to be tough, but I'll give it a shot. Nesvacil v. Kochiu. Okay, got it closer than I thought. Mr. Ginski is here for the appellate and for the affiliate, Michael Keehart. There are two issues presented in this appeal. The first issue is whether... Mr. Ginski, I'm sorry, I can't hear you. As I mentioned earlier, it's not an amplifying, it's just a recording device, so please speak up. I will speak up. Very good. There are two issues in this appeal. The first of which is whether, when medical testimony establishes that, more probably true than not, a single defendant caused an unusual medical result, which ordinarily does not occur in the absence of negligence, requiring that plaintiffs eliminate all other possible causes before allowing a res ipsa loquitur account to the jury, violates Article I, Section 2 of the Illinois Constitution, guaranteeing due process. And secondly, whether those same facts, again, whether, when the medical testimony establishes that, more probably true than not, a single defendant caused an unusual medical result, which ordinarily does not occur in the absence of negligence, requiring that plaintiffs eliminate all other possible causes before allowing that res ipsa loquitur account to the jury, conflicts with 735 ILCS 5-2-1113, the res ipsa loquitur statute. Incidentally, both of those issues are reviewed by this court de novo. And before getting into all of the facts, I'd like to discuss, on a preliminary basis, the Section 2-622 of the Code of Civil Procedure, mandating a certificate of merit in a medical case. That was passed by the legislature as a shield to medical practitioners, medical providers. It was not intended to be a sword. And in this particular case, it was, in fact, used as a sword rather than a shield. And that necessarily puts the plaintiffs at a disadvantage. Because, as the case originally is investigated, all that the plaintiff has, all that the plaintiffs have at their disposal are the medical records themselves. And it's typically a printout of what is now an electronic medical record. And what the plaintiff gets printed out, whether it's a request from the plaintiff herself or whether it's from her law firm, you never get all of the records. You just don't get all of the electronic medical records. You don't. What you get is a paper printout, and what prints out is not necessarily what's on the computer. But in any event, in this particular case, what was printed out included a, quote-unquote, pre-anesthesia workup. That pre-anesthesia workup sheet contained writing and the signature of two different anesthesiologists, Dr. Tamarazzi and Dr. Kochi. When plaintiffs' reviewing expert, a board-certified anesthesiologist, because it's an anesthesia case, initially reviewed this case, he's got that pre-anesthesia workup. And because pre-anesthesia means what it says, he doesn't know exactly what role each of those two anesthesiologists played in this case. And that cannot be discerned from the records. The only way that that can be discerned is to ultimately take depositions, which, of course, is what was done here. And when Dr. Kochi was deposed, when Dr. Tamarazzi was deposed, when the nursing staff was deposed, it became relatively clear that only Dr. Kochi was involved in the placement of this epidural catheter. And the uncontested testimony of every medical witness in this case, every medical witness in this case, plaintiffs 213F3 retained expert anesthesiologists. Dr. Richard Rack, who was the general surgeon who, frankly, saved Kristen Nesfasil's life at Carl Foundation Hospital. Dr. Kochi himself and his retained expert, Dr. Marcus, were all in agreement that the catheter was the cause of this abscess, number one. Number two, that it's very, very unusual for the placement of a spinal catheter to result in an abscess. It's exceedingly rare, is the testimony from virtually all four of those expert witnesses. And they were the only four to testify. And each and every one of those, again, including the defendant himself and his expert, said that it was highly unlikely that any individual, other than Dr. Kochi, was involved with this abscess. That after having access to the depositions, it became clear that the nursing staff didn't do anything other than stand in front of the patient. Kristen Nesfasil, as she's laboring, sits on the edge of the bed. Dr. Kochi works behind her. Excuse me, counsel, let me ask you this. But isn't it correct that your expert could not rule out the involvement of someone other than Dr. Kochi, specifically Dr. Tamarazzi? No, I disagree with that, Your Honor. Where we got into problems was that the initial Certificate of Merit, pursuant to 2622, which has to be appended to the complaint, or the complaint can't even be filed at the courthouse, did indicate that Dr. Tamarazzi might have been involved, and that the nursing staff might have been involved. But that 2622 Certificate of Merit concluded that these are preliminary opinions based upon a review of the record, and that the plaintiff's expert reserves the right to amend or clarify his opinions once we have access to the witnesses themselves and once they've been deposed. Once that did occur, he did change his position and say, it's relatively clear that only Dr. Kochi was involved in this abscess. And as I say, Your Honor, all four of the qualified medical witnesses that testified on that point agreed with him. Well, I recall a portion in your brief where I believe you asserted that that testimony, basically he was being facetious when making that testimony. So am I recalling this incorrectly? No, you're recalling that point correctly. And I will acknowledge that I wasn't real happy with the flippant nature of the witness, plaintiff's F3 witness, at his deposition. But the paper transcript doesn't reflect the intonation of the answer. It doesn't reflect any hesitation or a rise in voice. What you see is just the printed words. In his deposition, the plaintiff's expert said, when confronted with, well, isn't it possible? And again, the word is possible. And that, frankly, is the focus of this appeal. What is possible is not relevant. What is probable is what's relevant. Counsel, you've now referred at least a few times to Section 2622. And I'm a little surprised. I went back and just checked your brief, and there's no reference to it in your brief. And I'm not sure what the pertinence is of that section for the argument you're making to us now. Let me explain that, Your Honor. That was the focus of attention of cross-examination of plaintiff's expert, both at his deposition and at trial. That 622 was presented to the expert, plaintiff's expert, and he was questioned about, well, when you wrote this certificate of merit, you were also pointing the finger at Dr. Tamarazzi and the nursing staff, weren't you? And he was, because that is based exclusively on a review of records. That's well prior to the lawsuit being filed or well prior to any deposition. But given that pointed finger, why didn't you sue Tamarazzi as well? Because then I think I'm in violation of Rule 137. If, after Tamarazzi is deposed, and after the nursing staff is deposed, and it becomes clear that they're not involved in the placement of the catheter and the formation of the abscess, I'm in bad faith if I continue to sue those people. The thing is, step by step, initially, based upon the report you had under 2622, you had a basis to sue Tamarazzi, did you not? Yes. So it's your position that subsequently, during the course of discovery, you would have discovered that the basis to sue them no longer existed, and you couldn't in good faith pursue that under 137? That's correct, Your Honor. But the defendants are saying, oh, no, we're not totally responsible, it's Tamarazzi. It seems to me this is kind of a stretch on a 137 argument that you could have sued them to begin with and stayed there. I don't see, had you done that, for instance, given the very argument that we're hearing from the appellee, it seems hard that anyone could even raise a 137 issue that you're not acting in good faith. And I guess we have a difference of opinion on that. And actually, Dr. Tamarazzi and the nursing staff, they were initially in the lawsuit based upon that certificate of merit. It was after the depositions when Dr. Tamarazzi testified that all that he did is, the anesthesiologists are on call for a certain period of time, they can't work days on end. Dr. Tamarazzi was on call at the time that the attending obstetrician decided that a C-section needed to go forward. Dr. Kochi's out of the hospital at that point in time. What Dr. Tamarazzi does is once the patient's been taken into the operating room, which, as pointed out in Plaintiff's brief, is the most sterile environment in the hospital, and he's gowned, gloved, masked. He gives what's called a bolus dose of the anesthetic through the catheter, and then he removes the catheter. That's all he does, and that's in the operating room. The nurse, we depose the nurses as the mother is laboring. When she requests the catheter to be placed, the epidural, she's sitting on the edge of the bed, slightly hunched over, Dr. Kochi is behind her to place the catheter, and a nurse is standing in front of the patient so that she just doesn't fall off the bed. That's the role of the nurse. The nurse doesn't touch any of this. It's all within a sterile field that the anesthesiologist operates in. As a matter of law, had you not filed an amended complaint in January 2016, would there be any basis for the HEPA lead to say your reciprocal catheter count couldn't stand? I'm not following that question. Well, in January 2016, you filed an amended complaint naming only Dr. Kochi, if that's pronounced correctly. Yes. Eliminating the other people. Yes. Had you not chosen to eliminate the other people, wouldn't your reciprocal count be viable? In other words, their position seems to be you didn't name all the defendants, so this under Illinois law reciprocal doesn't apply, and I'm wondering why, having named all the defendants, you voluntarily chose in January 2016 to amend the complaint to eliminate the defendants they're saying you should have named. Based upon the arguments that were made, Your Honor, and based upon the trial court's interpretation of dicta and cases preceding this trial, it wouldn't have made any difference even if they had been in the case because we would have had to eliminate anybody who was even remotely potentially connected to this case. The judge ruled that anybody that had any potential contact with that patient, so we would have had to name her husband as a defendant. We probably would have had to name intake personnel. I'm sorry, what personnel? Intake personnel at the hospital. Intake? Intake. We would have had to name the circulating nurse in the operating room. We would have had to name the scrub nurse in the operating room. The argument before us here involves none of those people. It involves the people who you had named. But the ruling of the trial court is that their argument, that we didn't name all possible in the universe people who have had any role in this, then your res ips loquitur has to fall. But that's not what res ips loquitur is, Your Honor, because it's only evidence of who probably contributed to this, and actually in her ruling, Judge Foley actually said this and then nonetheless made the ruling that she did. When she ruled, and this is on page 9 of the initial brief of plaintiffs, when the court ruled, she said, and I'm quoting, Going back to Loizzo, L-O-I-Z-Z-O, and the transcript says Napoli, but it's supposed to be the Raleigh case. The case law tells us that the plaintiff's failure to name his defendants, all the entities who might have caused his injuries, is fatal to the action, since the plaintiff must eliminate the probable cause by someone other than any defendant. She's right. She's right, and we did. The testimony was uncontested from every medical witness that the only individual that had any probability of causing that abscess was Dr. Kochi. Plaintiffs did meet that standard. The judge then went on to say, Your Honor, what Judge Justice Steigman is now saying, that you've got to name everybody. The case law says anybody who had any possibility of contributing to this injury has to be named. That's impossible. We'd have to name the janitor who cleaned out the O.R. before that C-section case went into the O.R. So your position is the trial court knew the proper standard, but for some reason didn't use it. And I guess that brings me to the question of, I mean, are we really dealing with semantics here? Does the fact that the trial court said, you need to name everybody who's possibly involved or possibly caused it, does that mean the trial court did not use the correct standard that it just stated? No. There is case law that uses the, you've got to name all possible contributors as opposed to all probable contributors. The case law does say what the trial judge said. But she mixed the standards. She started off with the right standard. That was the first paragraph that's quoted on page nine of Appellant's brief. But then she ends up three paragraphs later talking about all possible contributors. And I guess that's my question. Just because she used all possible, does that mean she did not follow the appropriate standard? I mean, because obviously they filed their motion based on the absence of certain parties, and the court didn't mention other potential parties that should have been named or could be named. And so I think it's a stretch to say, well, we would have had to name the nurse, the husband, and all the people that you were mentioning earlier. I don't think it's a stretch at all because those are all the possible contributors. And that's the point that plaintiffs are making here in this court. Racist ipsa loquitur doesn't hinge on all possible contributors. It's probable contributors. In fact, the Illinois Supreme Court has so stated. And if, I mean, okay, it's all probable contributors, my recollection is that your expert indicated that while there was great likelihood that it was Dr. Kochi, could not rule out the possibility of it being Dr. Tamarazzi, however you pronounce that. I disagree with Your Honor. At the deposition, when Mr. Keyhart asked plaintiff's expert, isn't it possible that the nursing staff contributed to this abscess, the expert said, well, yeah, it's possible that they disconnected the catheter, spit on it, and reconnected it. That's what I was suggesting was facetious. You had to be there to understand the inflection. It came up with Dr. Tamarazzi, too, and plaintiff's expert said, well, it's possible that he did something that's completely undocumented in the chart and that that was the cause. Again, he was being relatively flippant. It was not a good moment in the deposition. I wish he hadn't done that. But that doesn't detract from the fact that we're in civil court. The standard of proof is what's more probably true than not true. It's an impossible burden to say to a medical plaintiff, res ipsa loquitur is off the table unless you name all possible, all possible defendants. The cause of action doesn't even exist. Because in a medical surgical case, you would have to name the scrub nurse, the circulating nurse, probably an x-ray technician, the janitor who cleaned out the room before the next case. You can't do that. And there's no, that's an impossible burden and it doesn't exist. And it's improper to focus on res ipsa plaintiffs and say you've got a higher standard of proof. You've got a higher burden of proof than any other civil litigant in the state of Illinois. Based upon dicta in certain cases that talks about all possible contributors. It's dicta. Unfortunately, the trial court got caught up in that dicta. I see my time's up. Thank you, Mr. Ginsky. You'll have rebuttal. Mr. Keyhart, I think I should also note for the record that Mr. Toth is here but not arguing, correct? That's correct. Thank you. Yes, may it please the court and counsel. I'm Mike Keyhart. I represent Dr. Kochi, the anesthesiologist here who actually placed the epidural catheter. I was thinking about this. It's been a long time since I've been in law school, but my expectation has always been that when we learned res ipsa back in school, there was that case of the warehouse where a passerby goes by and a barrel comes out of the second floor, hits the passerby, hurts him. And clearly that was a good case for res ipsa. Essentially what the plaintiff's trying to do is say, okay, let's take that, but then let's say there are three people up there on that second floor and each one of them at some point controlled that barrel, and that's the case here, applying to our facts. Then my expert can say, well, I picked number one, I picked number two, or I picked number three, and whatever I say gives me the right to use res ipsa against that defendant alone. That's not what res ipsa is. Now, let me just say, the plaintiff and his lawyer said, well, I was surprised by these facts. These medical records are not confusing. Different handwritings, the entries are dated, they're timed. But the fact of the matter is the plaintiff filed two 622 certificates as to the hospital. And clearly this patient encountered in the two or three days she was there aides and nurses and people of that sort. She was with Dr. Tamarazzi on the second day, who started the flow for her C-section. She was with Dr. Kochi the first day. All of these people encountered her, and all of them could have been the source of this microscopic thing that ultimately caused this problem, if it did. It was an epidural abscess in this case. What the plaintiff did in their two 622 certificate is Dr. Donner says, Dr. Kochi, you were negligent. You did cause this infection. Dr. Tamarazzi, you were negligent. You did cause this infection. Hospital, Roman, you were negligent. You did cause this. Counsel says, but gee, I couldn't have known. I just couldn't have known that. Well, you do if you read the records. The other thing is plaintiff's lawyers have access to health care providers. They can talk. Certainly I can't. But the fact of the matter is he had to do some pretty fancy footwork to explain how on the one hand he could say at the outset of the case each and every one of these people is negligent and caused it to then back off and say, oh, well, I was wrong about that. Because his expert changed his opinion. Sure he did. Well, yes, he said he did. But I don't know how you defend a case like that if you're one of these three people or one of these three parties. If all the plaintiff has to do is have their expert come in and say, I believe that the most likely is A or B or C, then the defendant's stuck with it. Let me ask you this. I asked Mr. Ginsky about his January 2016 amended complaint naming only Dr. Kochu as the defendant. You filed a motion for summary judgment saying the plaintiff couldn't bring a Dr. Kochu because he failed to join all other possible individuals. Prior to his amending his complaint in January 2016, had the plaintiff named all possible individuals consistent with the reception record account? Yes. All the people who logically could have been involved in this. The instrumentality is the catheter. Well, the point I'm making is prior to the amended complaint and his complaint initially filed asserting medical malpractice, could he have gotten an instruction receptional to the jury? Would that count have sufficed? Yes, if all three were in the case, he could. Did you file anything prior to January 2016 that was the cause of the plaintiff's amending his complaint? Well, I think we did a lot of discovery over the previous two years. We also attacked the complaint originally, the reception account, on a motion to dismiss. Judge Foley thought that was premature, and she was probably right. So we certainly raised it earlier. So do you have any further insight as to why in January 2016 this amended complaint was filed naming only Dr. Kocher? I think it was sometime in 2015 he dismissed out the other two parties. I think it was from maybe early 2015 through the time of trial that we were the only defendant. Well, I'm sure he thought he could get by with it. I'm sure he thought he could have reception. Well, the only explanation I've heard to this point is apparently Mr. Ginsky thought Rule 137 required him to withdraw other counts because there were other names because he couldn't in good faith bring them. But it seems to me your whole argument says, of course, in good faith he could bring them. He might not succeed, but he could bring the case. Happens all the time. Absolutely it does. I'm still kind of mystified. Let me follow up on that. So you said happens all the time that plaintiff's attorney's expert basically says there's only one person who's responsible here, and that's pretty much what happened here. And yet you're saying in spite of that, plaintiff's attorney should sue one, two, three other individuals even though the expert has said, no, we really don't have a case at all against those others. Let me clarify one thing. Plaintiff's expert, Dr. Dahmer, is the only one who says that this sort of injury can only happen with negligence. Everybody else says. Okay, I want to come back to that. But in response to what I just said, is that what you're saying, that plaintiff's counsel had an obligation to do to pursue a case against individuals when his own expert said, uh-uh? No, his own expert allows the possibility that those other defendants who were dismissed could have been the cause. But highly unlikely. Well, I don't know that he says highly unlikely. He uses this example the counsel says he was disturbed by. Well, maybe somebody came along and removed the cap and spit in there. Willie was being cute about it. But the fact of the matter is, there are hospital-borne infections all the time. Okay, let me ask you this. Suppose he had sued these three other individuals. They're going to get lawyers. Aren't they going to come in on either a motion to dismiss, a motion for summary judgment? Based upon his own expert. Sure. They were in there for a couple of years. They were defendants in this case. All during discovery. And what role does the fact that we're dealing with a claim based on race give to Lopewater? How does that impact our inquiry here? Well, that's the issue right there. If, in order to get, look, he could have absolutely dismissed those other people if he felt some ethical problem. He could have dismissed them and gone against us. But he doesn't get res ipsa. He doesn't do it. It is, now let me, we cited a couple of cases. Smith against Eli Lilly. Clearly said that. I think that's one Mr. Ginsky's saying, that's just a dip. That wasn't even a res ipsa case. It just happened to branch out into discussion against res ipsa and threw that language out. Yeah, well. Kind of out of the clear blue, at least from my reading. Well, I saw that. And then I also saw at Raleigh also. Yes. That there is language that you have to. That would certainly be one point. Yeah. But the, I think what the plaintiff is basically saying in this case is that if his expert says that one of those people is more likely, then he can thereby dismiss the others and simply have res ipsa. So that I have to come forward with evidence that we didn't do it. And under, I don't believe that's a law at all. I think Raleigh says that he has to name everyone. I think Eli Lilly, Smith says he has to name everyone. Okay. Well, I took you away from a point of interest, at least to me. And I want you to go back to it. And I think it had to do with what the experts said. And I think you were saying that it was only his expert that said it was highly unlikely that the other doctor and the nursing staff was involved. So if you'd follow up. Well, yes. The neurosurgeon, Dr. Rack, says, I don't know what the cause was. The infectious disease doctor, Dr. Geetha, says it may have been connected with the placement of the device, but she can't rule out other causes. Dr. Tamarazzi says, I don't know what the source of the infection was. There are many possible causes. Dr. Marcus says there are many possible causes. I don't know what the cause is. Only a plaintiff's expert, Dr. Dahmer, says, I know. And he looks at the deposition of my client taken a year or so before the trial, and he asks, how do you place this thing? And so my witness goes on for about 12 pages in detail without having the devices there in front of him and explains how you do these things. Aha, the plaintiff's expert says, I see here on page such and such. I see now what you did, and what you did was that you did things in the wrong order. You allowed bacteria to enter, and I know where it was. And so that's what he ended up trying to do in this case, but he couldn't sell it to the jury. Let me just say one other thing. Plaintiff's counsel argued to the jury. He says, well, basically our point was that that's ambiguous testimony from my client about the order in which he did things. Counsel argued to the jury, well, look, folks, there are pictures taken that they have all these devices. So clearly Dr. Kochi could have explained, used these things to kind of explain to me. That didn't happen until much later. After the deposition was over, we opened the packages and looked. So now the plaintiff was not held to any different standard than any other plaintiff using RayCipta that I know of in this state. I do not know of a single case, even though there's language in some of these cases that says that you don't have to exclude every conceivable cause in order to have RayCipta. That is not inconsistent with the cases, and I've never seen one where there are three or four possible defendants, possible causes, and the plaintiff gets to pick which one because his witness, his expert says, this is the one here. And so I ought to be prepared to go forward, and you should have to prove you weren't negligent. And that's not the way RayCipta works. It's unworkable. I don't know how you defend that case. Mr. Keyhart, is it inaccurate to say that Dr. Dauber indicated that he could not rule out the negligence of Dr. Tamarazzi? Early on, he said that he could not rule it out. But then he said, I saw the deposition, and I saw – here's what he says. I know the way the system works. And so I saw that it was Dr. Kochi that placed this thing on the evening of the first day, and even though there's nothing to indicate Dr. Tamarazzi was in there, well, he might have been. And so I was kind of thinking, well, maybe he was, and so I'm going to give this certificate. And then he goes forward with the case, and several years later, they dismiss Dr. Tamarazzi. It's obvious on the face of this that Dr. Tamarazzi played a totally separate role, and yet they sued him. I think that this was an effort to gain an advantage in this case by the plaintiff's lawyer, by using RayCipta in a case where it's simply not appropriate. There would have been no problem with this going forward. His expert says it could have been the acts of these other people that caused Tamarazzi or any of these nurses who did encounter this patient. She was there for two or three days at Roman Hospital in Bloomington. So any of those things could have happened. Nothing cultured out in this case, incidentally. We don't know the bacteria that caused this. The counsel never raised at any point until this level anything about due process. I think he's waived that argument. I don't think it adds anything to his case anyway. But I think clearly that the judge ruled correctly on the law. I think that if there are these people who could have, and the only person saying that much more likely than not it was my client, is his expert. Everybody else says, we don't know the cause. I did notice in the cases, I was a little surprised about this, that it is the trial court's determination as a matter of law whether to apply race-ups at all or not and under what circumstances. So Judge Foley was certainly within her rights to do it. She did the right thing. Okay. I don't see any questions, so thank you. Mr. Oginski, do you have some rebuttal? Yes, very briefly, Your Honors. Number one, we need to talk about what a spinal abscess is because there's statements that the patient, the laboring patient, the mother was in the hospital in Bloomington for a number of days, which she was. But a spinal abscess is a bacterial infection in the spinal column. It is 8 to 10 sonometers inside the patient's body. There's only one way bacteria can get to that point, and it's through the epidural catheter, and that's undisputed. Counsel says, well, everybody who testified said, we don't know the cause. That testimony was in conjunction with what type of bacteria caused the infection. Was it Clostridium perfringens? Was it another type of infection? They don't know because after the delivery, the baby was struggling and had to be air-flighted to Carl Foundation Hospital in Havana. Mom's running a fever, so she immediately starts getting Keflex, which is a broad-spectrum antibiotic. Antibiotics are effective. They kill the bacteria. You're never going to culture what bacteria caused the actual abscess after the administration of broad-spectrum antibiotics. So we're not talking about a hospital-born infection. This is not an osacomial infection. It's deep within the patient's body and can only get there through the catheter. Mr. Ginsky, I want to go back to what you were telling about Rule 137 and why you filed the amended complaint. I've rechecked the rule, and the rule states that your signature when you filed that complaint states that, to the best of your knowledge, information, and belief, it's essentially warranted by existing law, well-grounded in fact. Apparently, based on your 2622 responses, you had every reason to do that. Your discussion regarding this rule seems to suggest that there's a continuing duty upon you, however, that if you develop information after you filed a complaint that casts some doubt, perhaps, on some aspect of the complaint, that you have a duty to file an amendment to your complaint. Rule 137 says no such thing. As a matter of fact, I contrast that with, I just checked, 213J, which contains duty to supplement, saying a party has a duty to re-season, release, supplement, or amend any prior to answer. This is the discovery response, particularly with regard to expert witnesses. Whenever any new or additional information subsequently becomes known to that party. So I infer from that that the Supreme Court understands how new information can come to a lawyer, and if they wanted to make that a requirement of 137, they could have, but they didn't. Which leads me back to, why did you file this amended complaint in January 2016? I respectfully disagree with your interpretation of Supreme Court Rule 137, because it says it has to be well-grounded in the law and the facts. Well, it clearly was when you filed it, though, wasn't it? But, as we develop the facts, because we only have the paper chart when we initially investigate, that's what our expert looks at. So it's your position that 137 places a burden upon you to reconsider and amend your complaint if you develop information that suggests maybe there's a problem with what you originally thought? Absolutely. I believe that I would be operating in absolute bad faith if, after my expert tells me, look, now that I've seen the deposition testimony of Tamirazi, and now that it's been explained, and as the appendix in the reply brief, we have the pre-anesthesia workup. Dr. Tamirazi's handwriting, if it can be called that, is in the upper right-hand corner. Mr. Keyhart says that clearly explains what everybody's role was. I urge the Court to take a look at that and see if you can decipher exactly what that means, and if, given the fact that it's a pre-anesthesia worksheet, that Dr. Daugherty could have excluded Dr. Tamirazi at that point. He couldn't have, but back to Justice Stegman's question. I think I'd be operating in an utter bad faith if, after my retained expert, after all, he's the expert, I didn't go to medical school, and I'm not a board-certified anesthesiologist, but after he tells me that there's no credible basis to pursue Dr. Tamirazi, I think I'm making a mistake, ethically, to continue to pursue him. Plus, I think I'm also committing malpractice with respect to my client, because now Dr. Tamirazi and his attorney is going to be presenting evidence and saying, there's no credibility whatsoever on behalf of the plaintiffs, because they're suing my client, and their own expert says my client wasn't at all. With respect to the barrel analogy, that analogy, as drawn by counsel, is incomplete, because we've got three barrels up in the hayloft. In this case, the defendant says it was person number one that pushed the barrel out. Both retained experts say it was person number one that pushed the barrel out, and the treating surgeon from Carl Clinic says essentially the same thing. That's the proper barrel analogy. Thank you. Thanks to both of you. The case is submitted. The court stands in recess.